488 P.3d 1043
In the MATTER OF Robert E. ABRAMS
Supreme Court Case No. 20SA81 Supreme Court of Colorado.
June 7, 2021
Attorneys for Respondent-Appellant: Montgomery Little & Soran, PC, Christopher B. Little, Robin Jackson, Greenwood Village, Colorado
Attorneys for Complainant-Appellee: Jessica E. Yates, Attorney Regulation Counsel, Justin P. Moore, Assistant Regulation Counsel, David B. Shaw, Assistant Regulation Counsel, Denver, Colorado
En Banc
JUSTICE HART delivered the Opinion of the Court.
¶1 In an email responding to a client's question about a recent case management conference, attorney Robert Abrams referred to the presiding judge as a "gay, fat, fag."1 A hearing board of the Office of the Presiding Disciplinary Judge ("PDJ") found that Abrams violated Colo. RPC 8.4(g), which prohibits an attorney, in the course of representing a client, from referring to an individual involved in the legal process with language that exhibits bias or animus on the basis of sexual orientation. Abrams now asks us to overturn the decision of the hearing board. He contends that (1) Rule 8.4(g) violates the First and Fourteenth Amendments because it is unconstitutionally overbroad and vague and (2) the PDJ improperly limited relevant character testimony during his disciplinary hearing. Because we conclude that Rule 8.4(g) does not violate the U.S. Constitution, and that the PDJ's evidentiary rulings were not an abuse of his discretion, we affirm the hearing board's decision.
I. Facts and Procedural History
¶2 In October 2015, Michelle and Gary Bales hired Abrams to represent them in a dispute against Joseph Hewitt, a contractor they hired to build a new garage on their property. Abrams filed a complaint and jury demand on the couple's behalf in Arapahoe County District Court in December 2015.
¶3 On March 1, 2016, Abrams and his associate, Nicoli Pento, attended a case management conference before the presiding judge. At the conference, Abrams perceived the judge to be very hostile towards him. In fact, Abrams was so concerned by the judge's attitude that he decided to waive the Bales' demand for a jury trial because he was concerned that the judge would yell at him in front of the jury.
¶4 About a week after the conference, in an email exchange with his clients, Abrams explained this decision, as well as allegations made during the conference that the Baleses had threatened Hewitt. The Baleses expressed concern about Abrams's relationship with the presiding judge and asked whether Hewitt provided any proof of the alleged threat. Abrams responded:
He tried too [sic], but his evidence was irrelevant, therefore disregarded by the court, which caused your case to be dismissed. While I was getting your case dismissed (Hewitt's defamation case against you) I was getting yelled at by Fatso. The judge is a gay, fat, fag, now it's out there.
¶5 The Baleses ultimately prevailed in the litigation, but their relationship with Abrams soured over the course of the representation. In particular, the Baleses did not want to pay for the work that Pento had done on their case, having learned that he was a Florida attorney without a license to practice law in Colorado. After several months of back and forth over the fees, in September 2017, Abrams withdrew from the representation and filed suit against the Baleses to recover the unpaid attorney fees.
¶6 In late December 2017, Abrams received a letter from the Office of Attorney Regulation Counsel ("OARC") notifying him that the Baleses filed a request for investigation into his billing practices. After Abrams responded to the request, he sent a $897 invoice to the Baleses, purporting to charge them for the time he spent responding to OARC.
¶7 On May 16, 2019, OARC filed a complaint with the PDJ, alleging that Abrams violated: (1) Colo. RPC 8.4(g) for describing the presiding judge using an anti-gay slur in communication with his clients, (2) Colo. RPC 1.5(a) for charging the Baleses for time spent responding to the OARC's investigation, and (3) Colo. RPC 1.4 for failure to communicate certain information to the Baleses. The PDJ granted OARC's motion for summary judgment with respect to the claim that Abrams violated Colo. RPC 1.5(a), citing People v. Brown, 840 P.2d 1085, 1089 (Colo. 1992) (ruling that an attorney may not charge a client for time spent responding to a grievance filed with OARC). The remaining claims went to a hearing.
¶8 During the hearing, OARC and Abrams consistently disagreed about precisely what Rule 8.4(g) defines as misconduct. Abrams argued that he could only be found to have violated the Rule if OARC could demonstrate that he had an actual bias against homosexual people and that he used the anti-gay slur in his email to display that bias. OARC argued that Rule 8.4(g) does not require proof of an attorney's actual bias because it does not purport to regulate biased thoughts, but only to prohibit conduct or language, directed to a specific individual in the course of representing a client, that exhibits bias. The hearing board agreed with OARC's interpretation.
¶9 As a result of that interpretation, the PDJ made several evidentiary determinations that Abrams disagreed with. First, the PDJ limited testimony from a character witness, Steven Prelub. Abrams wanted Prelub to testify about the attorney's interactions with the Denver gay community in order to demonstrate that he did not personally harbor any anti-gay bias. The PDJ ruled that such evidence was irrelevant to the alleged violation of Rule 8.4(g) because the Rule "does not regulate bigotry; it regulates behavior." People v. Abrams, 459 P.3d 1228, 1239 (Colo. O.P.D.J. 2020). The PDJ accordingly considered Prelub's testimony as to Abrams's character and reputation only when determining the appropriate sanction.
¶10 The PDJ permitted testimony from Pento, over a relevance objection from Abrams, that Abrams regularly referred to the presiding judge using other variants of the anti-gay slur he used in the email to the Baleses, and that Abrams generally demeaned people who disagreed with him. The PDJ found that the testimony was relevant because it shed light on Abrams's understanding of the meaning of the language he used in the email to his clients.
¶11 The hearing board ultimately found that Abrams's use of the anti-gay slur in his email to the Baleses violated Rule 8.4(g). For this violation, and the violation of Rule 1.5(a), Abrams's license was suspended for three months, stayed upon the successful completion of an eighteen-month probation.2 The hearing board also required Abrams to attend ethics school and eight hours of cultural awareness and sensitivity training.
¶12 Abrams filed a notice of appeal with this court pursuant to C.R.C.P. 251.27.
II. Standard of Review ¶13 This court has plenary power "to review any determination made in the course of a disciplinary proceeding." C.R.C.P 251.1(d). We will affirm a hearing board's decision unless we determine that its findings of fact are clearly erroneous or that the form of discipline imposed is manifestly excessive, bears no relation to the complained-of conduct, or is otherwise unreasonable. C.R.C.P. 251.27(b). We review the hearing board's conclusions of law de novo. Id. ¶14 Hearings before a hearing board are conducted "in conformity with the Colorado Rules of Civil Procedure, the Colorado Rules of Evidence, and the practice in this state in the trial of civil cases." C.R.C.P. 251.18(d). The PDJ is responsible for ruling on all motions in the course of a hearing. C.R.C.P. 251.18(b)(2). We review the PDJ's evidentiary determinations for an abuse of discretion, reversing only when a ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. Murray v. Just in Case Bus. Lighthouse, LLC, 2016 CO 47M, ¶ 16, 374 P.3d 443, 450.
III. Analysis ¶15 We first turn to Abrams's claim that Rule 8.4(g) violates the First Amendment. We conclude that Rule 8.4(g) serves the state's compelling interests in regulating the conduct of attorneys during the representation of their clients, protecting clients and other participants in the legal process from harassment and discrimination, and eliminating expressions of bias from the legal process. The Rule is sufficiently narrowly tailored to serve these interests while limiting as little speech as possible. Moreover, Rule 8.4(g) is neither overbroad nor unconstitutionally vague. Thus, we conclude that the Rule is constitutional.
¶16 Next, we address whether the PDJ erred in limiting Prelub's testimony as to Abrams's character or allowing Pento's testimony as to other instances in which Abrams used anti-gay slurs to describe the presiding judge. We discern no abuse of discretion in the PDJ's evidentiary rulings.
A. Constitutional Challenge to Colo. RPC 8.4(g)
1. Attorney Regulation and the First Amendment ¶17 When a disciplinary rule implicates a lawyer's First Amendment rights, we must balance those constitutional rights against the State's interest in regulating the activity in question. Gentile v. State Bar of Nev., 501 U.S. 1030, 1075, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). "We begin with the well-established principle that attorneys are entitled to the same level of First Amendment protection as non-attorneys unless a state has a compelling interest in regulating some aspect of their speech or conduct." In re Foster, 253 P.3d 1244, 1251-52 (Colo. 2011) (citing NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ). ¶18 Lawyer speech that advances client interests, checks governmental power, or advocates on matters of public concern is provided the utmost protection under the First Amendment. See, e.g., In re Primus, 436 U.S. 412, 426-29, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) (discipline of non-profit attorney for soliciting and advising women who were coercively sterilized violated the First Amendment); Bates v. State Bar of Ariz., 433 U.S. 350, 381-82, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (a regulation prohibiting truthful, non-misleading attorney-advertising violated the First Amendment); Button, 371 U.S. at 444, 83 S.Ct. 328 (a regulation that barred the NAACP from soliciting clients affected by segregation violated the First Amendment). We must be very skeptical of regulations that curtail such speech, "[f]or a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." Button , 371 U.S. at 439, 83 S.Ct. 328 ; see also In re Green, 11 P.3d 1078, 1083 (Colo. 2000) ("[W]e begin with the accepted legal principle that if an attorney's activity or speech is protected by the First Amendment, disciplinary rules governing the legal profession cannot punish the attorney's conduct."). ¶19 However, this inquiry must be attuned to the vital role that the justice system plays in our society and the state's unique interests in regulating the legal profession. We have previously recognized that the state's interest "in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been ‘officers of the courts.’ " Green, 11 P.3d at 1086 n.7 (quoting In re Primus, 436 U.S. at 422, 98 S.Ct. 1893 ). In evaluating attorney regulations related to attorney speech, we must engage "in a balancing process, weighing the State's interest in the regulation of a specialized profession against a lawyer's First Amendment interest in the kind of speech that [is] at issue." Gentile, 501 U.S. at 1073, 111 S.Ct. 2720. ¶20 A state's interest in regulating attorney speech is at its strongest when the regulation is necessary to preserve the integrity of the justice system or to protect clients. Moreover, the Supreme Court has explained that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard" because the lawyer in that role is an officer of the court. Id. at 1074-75, 111 S.Ct. 2720 (holding that extrajudicial speech about a pending case can be punished if it poses a substantial likelihood of materially prejudicing an adjudicatory process); see also Ohralik v. Ohio State Bar Ass'n , 436 U.S. 447, 449, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (restriction on in-person solicitation of accident victims upheld because such solicitation is inconsistent with the ideals of attorney-client relationship and poses significant harm to prospective clients); Fla. Bar v. Went for It, Inc., 515 U.S. 618, 635, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (prohibition of direct-mail solicitation of accident victims within thirty days of accident upheld, in part, because it invaded prospective clients' privacy and eroded confidence in the profession).
2. Overbreadth and Vagueness ¶21 The overbreadth doctrine permits a litigant to bring a facial challenge to a law or regulation, arguing that, even if his own speech was not protected by the First Amendment, the law could target protected speech. People v. Graves, 2016 CO 15, ¶ 12, 368 P.3d 317, 322. This exception to traditional standing rules has been recognized as necessary to permit challenges to legal restrictions so broad that they might have a chilling effect on protected speech. Id. at ¶ 13, 368 P.3d at 323. ¶22 In order to succeed in an overbreadth challenge, a litigant must prove that (1) the regulation's overbreadth is real and substantial in comparison to its legitimate reach and (2) there is no adequate limiting construction that sufficiently narrows the regulation's application. Id. at ¶¶ 14-16, 368 P.3d at 323-24 ; Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In making this determination we must first construe the regulation in order to assess whether its application illegitimately proscribes any protected speech. Graves, ¶ 15, 368 P.3d at 323-24. If the regulation illegitimately prohibits only a minimal amount of protected speech, then the overbreadth challenge fails and "whatever overbreadth may exist should be addressed on a case-by-case basis." Id. at ¶ 15, 368 P.3d at 324. Additionally, if any potential overbreadth can be cured by a limiting construction or partial invalidation, we will apply such a construction or partial invalidation to preserve the regulation's constitutionality. Id. at ¶ 16, 368 P.3d at 324. ¶23 The constitutional prohibition on state laws or regulations that are unduly vague is rooted in the Fourteenth Amendment right to procedural due process. Id. at ¶ 17, 368 P.3d at 324. Due process requires that individuals have adequate notice of prohibited conduct so that they can conform their actions accordingly. Id. A state-imposed sanction violates due process if the underlying law or regulation "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). A heightened vagueness standard applies where the regulation in question threatens to inhibit protected speech. Graves, ¶ 18, 368 P.3d at 324. ¶24 Because the prohibition against vagueness turns on whether the challenged law provides adequate notice, a vagueness challenge fails "where reasonable persons would know that their conduct puts them at risk." Id. at ¶ 19, 368 P.3d at 325. Thus, we evaluate whether a regulation is vague by looking to the challenger's particular conduct and considering whether the regulation provided adequate notice that the conduct would constitute a violation. Id. We do not extend our inquiry into hypothetical applications of the law because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the [regulation] as applied to the conduct of others." Vill. of Hoffman Estates v. Flipside, 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).
3. Application ¶25 Applying the frameworks described above to Rule 8.4(g), we must first construe the Rule and determine if it impermissibly reaches speech protected by the First Amendment. In construing a Rule of Professional Conduct, we must interpret the text according to its generally accepted meaning. See Colo. RPC Scope cmt. 21. The comments accompanying each Rule illustrate the rule's purpose and are intended to help guide interpretation. Id. ¶26 Colo. RPC 8.4(g) provides that:
It is professional misconduct for a lawyer to engage in conduct, in the representation of a client, that exhibits or is intended to appeal to or engender bias against a person on account of that person's race, gender, religion, national origin, disability, age, sexual orientation, or socioeconomic status, whether that conduct is directed to other counsel, court personnel, witnesses, parties, judges, judicial officers, or any persons involved in the legal process.
We agree with the hearing board's conclusion that proof of a violation of this Rule does not require the People to demonstrate that an attorney actually harbors bias against a person on the basis of a protected classification. The Rule only addresses the attorney's outward behavior; it does not attempt to police whether a lawyer privately holds prejudicial beliefs. As the hearing board correctly concluded, "[t]he lawyer discipline system does not regulate bigotry. It regulates action." Abrams, 459 P.3d at 1244. ¶27 In regulating attorney conduct, Rule 8.4(g) includes several important limiting provisions. It prohibits only conduct—including speech or expressive conduct —that (1) occurs while an attorney is representing a client, (2) exhibits or is intended to engender bias against a specific person on account of a protected characteristic, and (3) is directed to a person involved in the legal process. Colo. RPC 8.4(g). Finally, as explained in comment 3 to Rule 8.4, "[l]egitimate advocacy respecting [a protected characteristic] does not violate" the Rule. ¶28 Given this construction, we first address Abrams's claim that Rule 8.4(g) is unconstitutionally overbroad. Although the Rule does prohibit some speech that would be constitutionally protected in other contexts, the Rule prohibits such speech in furtherance of several compelling state interests. Further, it is narrowly tailored so that any possible unconstitutional reach of Colo. RPC 8.4(g) is neither real nor substantial. The Rule, therefore, does not run afoul of the First Amendment. ¶29 Rule 8.4(g) serves several compelling state interests. It is well-established that the state has a compelling interest in regulating the legal profession both to protect the public and to ensure public confidence in the integrity of the system. Relatedly, the state has a compelling interest in eliminating expressions of bias from the legal profession, to promote public confidence in the system, and to ensure effective administration of justice. This also protects clients and other participants in the justice system from discrimination and harassment. There is no question that a lawyer's use of derogatory or discriminatory language that singles out individuals involved in the legal process damages the legal profession and erodes confidence in the justice system. ¶30 Further, Rule 8.4(g) is narrowly tailored to serve these interests. To violate the Rule, a lawyer's speech or actions must (1) occur in the course of representing a client, (2) "exhibit[ ] or ... intend[ ] to appeal to or engender bias" against a specific person on the basis of an identified protected classification, and (3) be directed to a specific person involved in the legal process. Colo. RPC 8.4(g). The Rule does not extend to any speech that legitimately furthers a client's interest or relates to the advocacy of policy or political goals, no matter how controversial.3 Further, so long as a lawyer refrains from discriminatory language, Rule 8.4(g) does not prohibit the criticism of judicial officers. See Green, 11 P.3d at 1083-85. ¶31 The narrow tailoring of Rule 8.4(g) is demonstrated by the limited number of times that OARC has charged violations of the Rule since its adoption in 1993.4 In nearly thirty years, only four other lawyers have been sanctioned for violating this Rule, and each of these instances involved conduct like that at issue here. See, e.g., People v. Gilbert, No. 10PDJ067, at 13-16 (Colo. O.P.D.J. Jan. 14, 2011) (lawyer sanctioned for referring to the judge as a "c***" while negotiating a plea deal for his client); People v. Wareham, No. 17PDJ021, 2017 WL 4173661, at *1 (Colo. O.P.D.J. Sept. 13, 2017) (lawyer sanctioned for telling a client's Black son that he was "behaving like some kid out of the ghetto"); People v. Frazier, No. 19PDJ053, 2019 WL 7604760, at *1 (Colo. O.P.D.J. Dec. 30, 2019) (lawyer sanctioned for calling his client's mother a "c***" in a text message); People v. Malouff, No. 20PDJ055, 2020 WL 5629838, at *1 (Colo. O.P.D.J. Aug. 25, 2020) (lawyer sanctioned for making several overtly sexual comments to a judge, clerk, and judicial assistant). Abrams's use of an anti-gay slur in an email to his clients to describe the presiding judge is exactly the type of conduct that Rule 8.4(g) permissibly proscribes. Abrams has not identified, nor do we perceive, a broad swath of speech that would be impermissibly limited by Rule 8.4(g) such that the Rule risks chilling or penalizing protected speech. Thus, the Rule is not unconstitutionally overbroad. ¶32 Abrams's contention that Rule 8.4(g) is void for vagueness also fails. Abrams contends that Rule 8.4(g) is unconstitutionally vague because it does not detail what exact words "exhibit[ ] or ... intend[ ] to appeal to or engender bias." We must address his claim in light of the conduct for which he was disciplined. Graves , ¶ 19, 368 P.3d at 325. If a reasonable person of ordinary intelligence would find that Abrams's conduct was clearly proscribed by Rule 8.4(g), then he cannot successfully attack the Rule as impermissibly vague. Id.
¶33 Any objective person would find that Abrams's specific use of an anti-gay slur in communicating with his clients about the presiding judge violated Rule 8.4(g). The word is pervasively understood as an anti-gay slur. Because Abrams's conduct is clearly proscribed by Rule 8.4(g), he cannot complain of any potential vagueness of the law as it might apply to others, and his claim must fail. See Graves, ¶ 19, 368 P.3d at 325. ¶34 For these reasons, we conclude that Rule 8.4(g) is neither overbroad nor vague. It is a constitutionally permissible regulation of an attorney's conduct as an officer of the court in the representation of a client.
B. The PDJ's Evidentiary Rulings
¶35 Abrams also contends that the PDJ erred by (1) limiting Prelub's testimony regarding Abrams's positive interactions with, and opinions about, the gay community to be used only for mitigation of the ultimate sanction; and (2) allowing Pento to testify about other incidents where Abrams referred to the presiding judge using anti-gay slurs. We address and reject each argument in turn. ¶36 The PDJ did not abuse his discretion when he limited Prelub's testimony involving Abrams's past interactions with, and opinions about, the gay community so that it was only admissible for purposes of mitigating the final sanction. Rule 8.4(g) does not require proof that the lawyer acted in conformity with personally held biased beliefs. Therefore, any evidence relating to Abrams's positive interactions with the gay community and his lack of anti-gay bias is not relevant to whether he violated the Rule. ¶37 The PDJ also did not abuse his discretion when he allowed Pento to testify about other incidents where Abrams used anti-gay slurs to refer to the presiding judge. Under CRE 404(b), evidence of past acts may be used to show intent and knowledge. Throughout the hearing, Abrams insisted that he did not use the word "fag" in his email as an anti-gay slur, but as a way of describing the judge as weak. Pento's testimony about other incidents in which Abrams described the judge with anti-gay slurs was therefore probative of Abrams's knowledge of the anti-gay slur's derogatory nature when he used it in the email to the Baleses. The PDJ was well within his discretion to make such a finding. Further, even if the PDJ erred in admitting this testimony, the error was harmless. There was sufficient evidence for the hearing board to find that Abrams knew or reasonably should have known the meaning of the anti-gay slur in the email to his clients. ¶38 Abrams also contends that he was not provided adequate notice of Pento's testimony and, therefore, that the admission of such testimony violated his right to due process under In re Ruffalo, 390 U.S. 544, 550-52, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). Due process requires that a lawyer accused of violating a rule of professional conduct must be provided with the precise nature of the charges against him. Id. Abrams was charged with violating Rule 8.4(g) solely for his use of the anti-gay slur in an email to his clients. Abrams was provided with ample notice of this charge. Pento's testimony did not expand the charges against him, rather, it simply provided context for that single charge. Accordingly, Abrams's right to due process was not violated by the admission of Pento's testimony. IV. Conclusion ¶39 As the hearing board eloquently explained, "[i]n his private life, [a lawyer] is free to speak in whatever manner he chooses. When representing clients, however, [a lawyer] must put aside the schoolyard code of conduct and adhere to professional standards." Abrams, 459 P.3d at 1241. The professional standards required by Colo. RPC 8.4(g) serve the state's compelling interests in regulating the legal profession, eliminating expressions of bias from the legal process, and protecting clients. The Rule is narrowly tailored to serve those interests and is neither unconstitutionally vague nor overbroad. Consequently, we affirm the hearing board's judgment imposing sanctions.
1 We reluctantly reproduce this anti-gay slur here in order to give an accurate and uncensored account of the facts.
2 The board concluded that Abrams's failure to inform his clients that Pento was not licensed to practice law in Colorado was not a violation of his obligation under Rule 1.4 to communicate with his clients because it was an internal staffing decision that he was entitled to make without client consultation.
3 Notably, Colorado's Rule 8.4(g) is significantly narrower than the American Bar Association's Model Rule 8.4(g), which prohibits an attorney from "engag[ing] in conduct that the lawyer knows or reasonably should know is harassment or discrimination [on the basis of a protected characteristic] in conduct related to the practice of law." That rule has been the subject of considerable debate. See Rebecca Aviel, Rule 8.4(g) and the First Amendment: Distinguishing Between Discrimination and Free Speech, 31 Geo. J. Legal Ethics 31, 34-35 (2018). The Model Rule does not contain the limiting factors that narrow the reach of Colorado's Rule 8.4(g) to a permissible scope.
4 The language of Colo. RPC 8.4(g) was initially contained in Colo. RPC 1.2(f) (1993), but the Colorado Rules of Professional Conduct were amended to conform more closely to the ABA Model Rules of Professional Conduct in 2008. See Alec Rothrock, ABA Model Rule 8.4(g) : Should Discriminatory Conduct or Remarks Outside the Representation of a Client have Disciplinary Consequences?, The Docket (Feb. 7, 2017), http://www.dbadocket.org/ethics/aba-model-rule-8-4g-rothrock/ [https://perma.cc/2HVT-NEUZ].