IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2023

## LORING E. JUSTICE v. BOARD OF PROFESSIONAL RESPONSIBILITY

**Direct Appeal from the Chancery Court for Knox County**
**No. 203310-2          Thomas J. Wright, Senior Judge**

_____

**No. E2022-01105-SC-R3-BP**

_____

This is a direct appeal of a disciplinary proceeding involving a Knoxville attorney who filed four motions containing pejorative statements about the trial judge in a child custody case involving the attorney's minor child. A hearing panel of the Board of Professional Responsibility determined that the attorney violated multiple Rules of Professional Conduct and imposed a three-year suspension as punishment. The attorney appealed to the trial court. The trial court affirmed the hearing panel's judgment in all respects with the exception of the attorney's punishment. The trial court held that the hearing panel erred in imposing a suspension, and it increased the punishment to disbarment. The attorney appealed to this Court. We affirm the judgment of the trial court on all issues with the exception of the issue regarding the attorney's punishment. We hold that the trial court erred in increasing the punishment to disbarment, and we reinstate the three-year suspension imposed by the hearing panel but modify it to take effect upon the filing of this Opinion.

**Tenn. Sup. Ct. R. 9, § 33.1(d); Judgment of the Chancery Court Affirmed in Part and Reversed in Part**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which SHARON G. LEE, ROGER A. PAGE, and SARAH K. CAMPBELL, JJ., joined. HOLLY KIRBY, C.J., filed a separate opinion concurring in the judgment.

Linn M. Guerrero, Knoxville, Tennessee, for the appellant, Loring E. Justice.

James W. Milam, Brentwood, Tennessee, for the appellee, Board of Professional Responsibility.

# OPINION

## I. Factual and Procedural Background

Loring Edwin Justice has been licensed to practice law in Tennessee since 1998. On January 4, 2018, the Board of Professional Responsibility ("Board") filed a petition for discipline against Mr. Justice alleging that he violated the Rules of Professional Conduct ("RPC") during the course of a Roane County Juvenile Court custody case involving his minor child and the minor child's mother ("Plaintiff"). Mr. Justice represented himself throughout the dispute with Brian Chadwick Rickman serving as co-counsel. The custody case began in 2004 and was contested until 2007, when it went dormant for several years. Nelson v. Justice, No. E2017-00895-COA-R3-CV, 2019 WL 337040, at *1 (Tenn. Ct. App. Jan. 25, 2019). However, in 2013, the custody dispute resumed. Id. at *2-3. After at least two judges recused themselves from the case, Judge Don Ash was designated to preside over the matter. A trial was held on multiple days over two years, and, on April 11, 2017, the trial court entered an order resolving the matter. Id. at *3, 10-11.

Following the resolution of the custody case, Judge Ash sent a letter to the Board to make it aware of a number of insulting statements Mr. Justice and Mr. Rickman made during the proceedings. Judge Ash attached a number of documents to his letter for the Board's review, including several motions filed by Mr. Justice and Mr. Rickman, transcripts of court hearings, and court orders.

After an investigation, the Board filed a petition for discipline against Mr. Justice on January 4, 2018, in which it alleged that Mr. Justice violated RPC 3.5(e),[1] RPC 8.2(a)(1),[2] and RPCs 8.4(a) and (d).[3] The allegations in the petition arose out of four motions filed by Mr. Justice that contained inflammatory statements about Judge Ash: a Motion for Expanded Holiday Co-Parenting, a Motion to Strike Report of Dr. James Murray, a motion for interlocutory appeal, and an Amended Motion to Recuse with Motions for Disclosure and Other Motions Incorporated.

---

[1] RPC 3.5(e) provides that "[a] lawyer shall not: . . . engage in conduct intended to disrupt a tribunal." Tenn. Sup. Ct. R. 8, RPC 3.5(e).

[2] RPC 8.2(a)(1) provides that "[a] lawyer shall not make a statement that the lawyer knows to be false or that is made with reckless disregard as to its truth or falsity concerning the qualifications or integrity of . . . a judge." Tenn. Sup. Ct. R. 8, RPC 8.2(a)(1).

[3] RPCs 8.4(a) and (d) provide that "[i]t is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another . . . [and] (d) engage in conduct that is prejudicial to the administration of justice." Tenn. Sup. Ct. R. 8, RPC 8.4(a), (d).

The first motion, the Motion for Expanded Holiday Co-Parenting, included a statement that "[t]he Court repeatedly is confused or pretends that the burden of proof is on Defendant to show some change has occurred. The Court persistently articulates differing and nebulous standards for Defendant to transcend and then changes them when Defendant does."

The second motion, the Motion to Strike Report of Dr. James Murray, contained the following statements:

The appearance, perhaps not the reality, but the appearance is the Court is deliberately stacking the record to assist its favored party, the Plaintiff.

The Court simply knows better than this as we all do and such an aberrant decision is evidence the Court has profound disdain for Defendant such the Court cannot see the best interests of [the minor child].

The third motion, the motion for interlocutory appeal, contained numerous insulting and inflammatory statements:

Plaintiff is holding [the minor child] hostage for money, which is child abuse, and the Court refuses to speak to this issue to any significant degree.

Further, rather than adopting the posture of a neutral Judge, the Court attempts to hijack the presentation of Defendant's case, and, as discussed below, attempts to intimidate witnesses.

Will even the Court contend it has met the standard of "detachment" and "aloofness" that are part of the American rule?

Respectfully, it is straight up bizarre to use Rule 403 in a bench trial, and this is proof positive the Court has lost its way.

In these circumstances, it is not improper to describe this level of bizarreness in a case involving child welfare as a farce.

In these circumstances, any Judge thinking properly would insist on greater formality than normal, rather than chatting [Plaintiff] up about their mutual friend, "Gerald," among other things.

At this point, a reasonable outside observer would find an appearance of bias or there would be grounds for disqualification for the appearance of a lack of competence if the Court knows no better than this.

It would appear to a reasonable outside observer the Court is simply playing a shell game with a child.

The Court yelled a denial at Dr. Brown of her recommendation [Plaintiff] undergo individual psychotherapy to achieve [the minor child's] best interests.

This is such a loss of judgment a reasonable outside observer would find the proceedings to have the appearance of corruption.

The Court's demeanor is so hostile as to preclude a fair trial.

A Judge that ignores inappropriate touching of a witness while testifying is a Judge who appears to be in the bag.

When a Court's persistent demeanor is less in the nature of Learned Hand or Oliver Wendell Holmes and more Yosemite Sam, particularly in a matter involving child welfare, the Court cannot continue to preside and this Court ought to allow interlocutory appeal to determine if the appellate court can assist it is (sic) resolving this case.

Which of the three or four inconsistent stories the Court told about this is true?

This has now been compounded because during the only hearing at which Mr. Justice was not present, because he was going to get a cashier's check for $200,000.00 of the $400,000.00 he was to pay [Plaintiff] in hopes to have a meaningful relationship with his son and to see him unsupervised, the Court bizarrely went off the record and chatted up [Plaintiff].

It would be no burden on the Court to change venue but the Court stubbornly refuses, fostering the appearance of corruption in a case in which we already have documented judicial corruption (former Judge Austin), Judge Brewer's "conflict of interest" and an opiate infused witness, Dr. Nordquist.

It would appear to a reasonable outside observer that something is wrong with the Court. These are not personal attacks on the Court but recordation of the events of this bizarre proceeding necessary for interlocutory appeal.

- 4 -

In short, it is about appearances and here, in the words of the United States Court of Appeals, the appearances regarding the integrity of this proceeding are as pungent as "the force of a five-week old, unrefrigerated dead fish."

The absurdity of this is palpable.

The Court appears as a bully who has "issues" with the defense or relative to the Plaintiff and attempts to intimidate against zealous advocacy for [the minor child's] welfare.

Then, the Court rudely, abruptly, and disparagingly denied Defendant's motion regarding individual therapy for Plaintiff, as Dr. Brown testified it would be beneficial and in the best interests of [the minor child].

However, the Court addressed her as one would address the Queen of England if they were ambassador to the Court of St. James. This is bizarre given her weirdly conflicting testimony and it is NOT THE ROLE OF A COURT TO PLAY MASTER OF CEREMONIES. The Court has precious little time for hearings and trial for [the minor child]; it creates an appearance of impropriety and it wastes what time it will allow with overly effusive speeches that do not help anything and hurt when contrasted with the maltreatment of witnesses who furnish defense favorable information.

But, to this Court, with an opportunity for a soliloquy, Judge Humphrey is the reincarnation of Louis Brandeis.

The appearance is Mr. Justice might be the better parent; but [Plaintiff] is in with the "good old boys" and she got a very marginal Judge who was a buddy of Judge Brewer to bless her contempt and this Court is unwilling to confront the appearance of incompetence and corruption represented by Judge Brewer and Judge Humphrey, and [Mr. Justice] and [the minor child] cannot be reunited because [Mr. Justice] crossed a line: he made a fool out of Judge Humphrey on the witness stand and Judges stick together; just read the soliloquy.

The appearance is, particularly in light of the Judge's "off the record" discussion with [Plaintiff], that the Court is more interested in making the Roane County courthouse crowd happy and receiving their daily smiles than he is in caring for [the minor child's] best interests.

Also, in another way, this soliloquy is problematic: to an outside observer it would appear the Court may be using this as backdoor self-glorification or

for secondary gain. That is, given the situation is wholly impertinent to [the minor child], and given the soliloquy, before a courtroom audience glorifies the Court (took her to the shelter) [and] (his daughters helped her pick out clothes), the appearance is the Court has a secondary gain from being perceived as a "good man" by the Roane County courthouse gallery.

In so ruling, the Court articulated yet another, differing, nebulous and ever-shifting standard as what must be proven to achieve the normalized, unsupervised co-parenting schedule for [the minor child] and Defendant that all expert proof indicates is needed in [the minor child's] best interest.

Once again, the Court uses the *ipso facto* fallacy that is the province of tyrants: *it is so because I say it is so*, without explanation.

An interlocutory appeal is justified because to all appearances the Court runs from certain evidence as if it is the Black Plague.

WILL THE COURT PLEASE ADDRESS THIS CASE LAW? IF IT WILL NOT, CAN THE COURT POSSIBLY CONTEND INTERLOCUTORY APPEAL IS NOT JUSTIFIED?

The appearance of judicial misadministration and the bizarre, crawling, years-long trial structure, coupled with the corruption of Judges Austin and Humphrey (or possibly just significant incompetence by Judge Humphrey, indistinguishable from active corruption) joined with the Court chatting up [Plaintiff] off the record and attached to the fact the Court will not comment on [Plaintiff] attempting to SELL UNSUPERVISED TIME WITH [THE MINOR CHILD], is so grave it is a violation of [the minor child] and [Mr. Justice's] federal civil rights under color of state law.

Again, it does not create an appearance of objectivity when the Court runs from certain issues as if they are the Ebola virus.

By suppressing this evidence, the Court has sanctioned child abuse in the form of Plaintiff's leveraging her near total control of [the minor child] to hold him hostage for money.

Also, again, the appearance is of a pungent smell. On the evidence in this brief, no party or lawyer can be intimidated by a Court into remaining silent and accepting "gas lighting" or an "Emperor's New Clothes" scenario.

- 6 -

The fourth motion, the Amended Motion to Recuse with Motions for Disclosure and Other Motions Incorporated, contained the following statements:

> Again, it does not create an appearance of objectivity when the Court runs from certain issues as if they are the Ebola virus.

> It is yet another false claim of dishonesty by the Court, demonstrating it is inappropriate as a matter of appearance if not fact, for the Court to continue hearing this case. The strong appearance is if the Court cared as much about [the minor child's] mother lying about attempting to sell time with him as the Court does about falsely accusing Defendant and his counsel, [the minor child] would be much better off. Further, it is evident or at least it would be thought by an outside onlooker, caught in apparent lies about reading the entirety of Dr. Nordquist's deposition and on the amount of time Mr. Rickman had spent examining Ms. Guerrero, the Court is embittered and either consciously or unconsciously "creating" veracity issues about Defendant and Defendant's counsel, due to the ego injury the Court has suffered by the apparent revelation by them of its own recurrent dishonesty . . . .

> For the Court to suggest, it might call [the minor child] as a witness here, given the Court's denied, but obvious, antipathy for his [f]ather, shows such a loss of judgment by the trial court that it ought to recuse. [The minor child] should not be sacrificed as a means in the Court's efforts to assist [the minor child's] mother against his [f]ather. This is sick and abusive like the deliberate ignorance of the human trafficking [the minor child's] mother and her attorneys have attempted to broker regarding [the minor child].

In addition to these four motions, the petition for discipline also contained hearing transcripts and trial court orders from the child custody case showing that the trial court ordered Mr. Justice and Mr. Rickman on multiple occasions to cease from making inappropriate statements about the court but that they continued to do so. In particular, the trial court entered an order on January 2, 2017, in which it instructed Mr. Justice and Mr. Rickman to "refrain from their practice of making negative comments about the Court personally in their pleadings." Additionally, in an order denying Mr. Justice's motion for interlocutory appeal, the trial court noted that Mr. Justice and Mr. Rickman "escalated their personal attacks" on the trial court despite "repeated requests to curb such behavior."

Before a hearing on the petition for discipline was held, the parties filed a number of pre-hearing motions with the hearing panel and the trial court. Three particular pre-hearing matters that arose are important to note. The first was a discovery dispute involving a set of five interrogatories that the Board served on Mr. Justice on July 18, 2018. The first

four interrogatories sought information regarding Mr. Justice's level of involvement in the preparation, editing, review, and approval of the motions containing inflammatory statements that formed the basis of the petition for discipline. The fifth interrogatory asked why Mr. Rickman was no longer associated with Mr. Justice's law practice. Mr. Justice objected to answering each of the interrogatories, claiming they were protected by the attorney-client privilege and the work product doctrine. On September 28, 2018, the Board filed a motion to compel responses to the interrogatories, which the hearing panel granted through entry of an order on June 5, 2019. In the order, the hearing panel stated that if Mr. Justice were to assert the attorney-client privilege or the privilege against self-incrimination in his response, Mr. Justice would be required to "detail the necessary foundation for assertion of either privilege." In a scheduling order entered on September 1, 2020, the hearing panel ordered Mr. Justice to produce responses to the interrogatories within fourteen days.

On October 9, 2020, after it still had not received responses to the interrogatories, the Board filed a motion for sanctions. In its motion, the Board asked that it be deemed admitted that Mr. Justice "prepared, read, approved[,] and filed the offensive pleadings . . . or, in the alternative, prohibit [Mr. Justice] from testifying or allowing others to testify or submit any written documentary proof that [Mr. Justice] *did not* prepare, read, approve[,] and file the offensive pleadings." The hearing panel granted the motion for sanctions, finding that "[n]o just cause existed" for Mr. Justice's failure to comply with the June 5, 2019, and September 1, 2020 discovery orders. Accordingly, the panel deemed admitted that Mr. Justice "prepared, read, and/or approved" the four motions containing inflammatory statements upon which the petition for discipline was based.

The second pre-hearing matter of note was a motion for summary judgment that Mr. Justice filed on November 13, 2018.[4] In a December 17, 2018 filing, the Board asserted that it should not have to respond to the motion for summary judgment until it obtained the discovery it sought. Specifically, relying on Tennessee Rule of Civil Procedure 56.07,[5] the Board stated that it had not been able to take the deposition of Mr. Rickman or Mr. Justice

---

[4] Prior to filing this motion for summary judgment, Mr. Justice filed a "Motion to Dismiss or Alternatively Motion for Summary Judgment" on September 17, 2018. The hearing panel treated the motion as a motion to dismiss, which it denied. In the order denying the motion, the hearing panel stated, "To the extent that the motion is a motion for summary judgment, it is denied as not properly supported and may be refiled at a later time."

[5] Tennessee Rule of Civil Procedure 56.07 provides:

> Should it appear from the affidavits of a party opposing the motion that such party cannot for reasons stated present by affidavit facts essential to justify the opposition, the court may refuse the application for summary judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

and that Mr. Justice had not answered its interrogatories. The Board did not submit an affidavit to support its request for additional time to conduct discovery. In an order entered on June 5, 2019, the hearing panel stated that the Board should have its discovery before being required to respond to the motion. The hearing panel noted that the deadline for discovery to be completed was September 20, 2019, and it set September 30, 2019, as the Board's deadline to respond to the motion for summary judgment. The Board filed a second response to the motion for summary judgment on September 30, 2019. In its response, the Board objected to Mr. Justice's statement of undisputed facts and asserted that many of Mr. Justice's statements were legal conclusions rather than facts.

On April 29, 2020, the hearing panel denied Mr. Justice's motion for summary judgment. The hearing panel determined that the petition for discipline sufficiently alleged facts that, taken as true, established violations of RPCs 3.5(e), 8.2(a), 8.4(a), and 8.4(d). The panel concluded that Mr. Justice's denial of responsibility for the inflammatory statements forming the basis of the petition for discipline created a genuine issue of material fact for determination, and Mr. Justice had not shown, as a matter of law, that there was no dispute of fact on that issue.

The third pre-hearing matter was a dispute regarding the deposition of Judge Ash. The parties filed several motions with the trial court and the hearing panel concerning Judge Ash's deposition, but we will only recount the details pertinent to this appeal. Mr. Justice initially obtained a subpoena from the trial court for the deposition of Judge Ash. After the Attorney General's office objected to the deposition on behalf of Judge Ash, Mr. Justice filed a motion to enforce the subpoena. At a September 17, 2020 hearing on the motion, the parties reached an agreement that Judge Ash's deposition would be taken for proof and that no further appearance at a hearing or deposition would be required from him. The trial court entered an order on October 29, 2020, noting that the motion to enforce the subpoena had been resolved by agreement of the parties and that the court had "no further participation concerning the deposition."

Judge Ash's deposition took place on October 22, 2020, with Mr. Justice questioning him. At some point before the questioning concluded, due to hostility between the parties concerning the questions that were being asked, Judge Ash left the deposition.

Mr. Justice filed a motion with the trial court asking it to hold Judge Ash in contempt and to enforce its September 17, 2020 ruling. On December 21, 2020, the trial court held a hearing on the motion, as well as various other motions concerning Judge Ash's deposition filed by Mr. Justice, the Board, and Judge Ash. During the hearing, the trial court denied the motions, holding that it did not have jurisdiction over them because Tennessee Supreme Court Rule 9, section 19 limited its jurisdiction to matters concerning subpoenas. The trial court explained that there presently was no active subpoena, as Mr. Justice's initial subpoena had been replaced by the parties' agreement regarding Judge

Ash's deposition on September 17, 2020. With regard to Mr. Justice's motion to enforce, the trial court pointed out that it had not compelled Judge Ash to attend the deposition and had only noted in its October 29, 2020 order, which was entered a week after the deposition took place, that the parties had reached an agreement regarding Judge Ash's deposition. As such, there was nothing in the order that the court could enforce.

Mr. Justice then sought relief with the hearing panel, asking it to hold a hearing on the motions he had filed in the trial court and to compel Judge Ash to continue his deposition. The hearing panel denied Mr. Justice's motions, holding that the motions were not properly before it because they had been heard in the trial court, but the trial court had not yet entered any order. The hearing panel also held that it could not "issue an order compelling a deposition that it did not order."

After approximately three years of extensive pre-hearing proceedings, a ZOOM hearing on the Board's petition for discipline took place on January 14, 2021. Mr. Justice was represented by Linn Guerrero. The Board called one witness, Mr. Justice, but he did not testify because he was not present and had not been subpoenaed. Mr. Justice did not call any witnesses. A number of documents were introduced into evidence, including much of the record of the child custody case.

On March 26, 2021, the hearing panel entered its findings of fact and conclusions of law. As part of its findings of fact, the hearing panel determined that "[a] reasonable attorney would not believe there was a factual basis for many of the statements made in the four motions that Mr. Justice prepared, read[,] and/or approved." The panel characterized the language in the motions as "accusatory and designed to chastise the court." The panel found that the language was "intentionally chosen" and that Mr. Justice was "consciously aware of the nature of the motions." The motions "included statements and language with no regard as to the truth or falsity concerning the integrity of Judge Ash" and "undermined public confidence in the administration of justice." The hearing panel found that a "reasonable attorney would believe the statements filed in the four motions . . . were filed for the improper purposes of harassment, delay[,] and to needlessly increase litigation costs and that they constitute abusive and obstreperous conduct which was intended to disrupt the proceeding . . . and influence the review of the appellate court." Finally, the hearing panel found that "Mr. Justice's intentional acts of misconduct caused injury in disrupting the proceeding, causing delay that resulted from time taken in the proceeding to address the inappropriate statements in the motions, and undermining public confidence in the administration of justice."

Based on these findings of fact, the hearing panel concluded that Mr. Justice violated RPCs 3.5(e), 8.2(a)(1), 8.4(a), and 8.4(d) as alleged in the Board's petition.

The hearing panel then applied the American Bar Association Standards for Imposing Lawyer Sanctions to determine the appropriate punishment for Mr. Justice's misconduct. The hearing panel determined that ABA Standards 6.12,[6] 6.22,[7] and 7.2[8] applied and that a suspension would be the baseline sanction. See Standards for Imposing Lawyer Sanctions §§ 6.12, 6.22, 7.2 (Am. Bar Ass'n, amended 1992). It explained that it selected these Standards because "Mr. Justice knowingly violated the [trial court's] order on [January 2, 2017,] to cease from filing motions with derogatory language" by filing two more motions with offensive statements. The hearing panel stated that, in filing these motions, Mr. Justice "intended to interfere with the legal proceeding and obtain a benefit through securing his desired personal outcome in the proceeding" and that Mr. Justice intended to deceive the court that would review the matter on appeal. The hearing panel also stated that Mr. Justice's pejorative statements were "so prejudicial to the administration of justice that they significantly undermine the integrity and public confidence in the administration of justice."

The hearing panel then considered applicable aggravating and mitigating factors to determine the appropriate discipline against Mr. Justice. The panel found that the following aggravating factors justified an increase in the degree of discipline to be imposed: (1) Mr. Justice's prior disciplinary history—specifically, Mr. Justice's disbarment from the practice of law on July 2, 2019, in a separate disciplinary matter; (2) a pattern of misconduct; (3) refusal to acknowledge the wrongful nature of his conduct; and (4) substantial experience in the practice of law. The panel did not find any applicable mitigating factors.

The hearing panel ultimately recommended that Mr. Justice be suspended from the practice of law for three years "from the date, if any, when he is reinstated to practice law,

---

[6] ABA Standard 6.12 provides that

[s]uspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

[7] ABA Standard 6.22 provides that "[s]uspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding."

[8] ABA Standard 7.2 provides that "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty as a professional and causes injury or potential injury to a client, the public, or the legal system."

pursuant to [Tennessee Supreme Court Rule] 9, [section] 12.2."[9] The panel also concluded that Mr. Justice should be required to complete six hours of continuing legal education related to ethics for six consecutive years after the expiration of his suspension. Finally, the panel assessed the costs of the disciplinary proceeding against Mr. Justice and required that they be paid before he could be reinstated to the practice of law.

On September 27, 2021, Mr. Justice filed a petition for review pursuant to Tennessee Supreme Court Rule 9, section 33.1(b) in which he challenged the panel's finding that he violated the RPCs. In addition, Mr. Justice made two procedural challenges in his trial court brief: (1) he argued that his motion for summary judgment should have been granted because the Board's response to his motion, in which it requested additional time to obtain discovery, was not supported by an affidavit as required by Tennessee Rule of Civil Procedure 56.07; and (2) he argued that the hearing panel abused its discretion in sanctioning him for his failure to answer the Board's interrogatories. Although he did not designate it as an issue in the "Questions Presented" section of his brief, Mr. Justice also argued that he was prejudiced by Judge Ash's and disciplinary counsel's conduct during and after Judge Ash's deposition.

The trial court held a hearing on the petition on June 7, 2022. On July 15, 2022, the trial court entered an order denying relief to Mr. Justice on the issues he raised.

With regard to Mr. Justice's argument that his motion for summary judgment should have been granted, the trial court determined that the Board should have supported its request for additional time to respond to the motion for summary judgment with an affidavit. However, the trial court held that the hearing panel did not abuse its discretion in allowing the Board to have additional time to respond, as "the facts that would have been alleged in . . . an affidavit [were] clearly apparent in the Administrative Record existing before the Panel at the time it granted the Board's request."

Furthermore, the trial court held that even if the hearing panel's granting of additional time were an abuse of discretion, Mr. Justice would not have been entitled to summary judgment because the motion merely repeated a legal conclusion—that the Board could not prove its case. The trial court held that there was sufficient evidence in the record to defeat Mr. Justice's statement in his motion for summary judgment that there was no evidence that he knew about, read, prepared, or approved the filings containing the inflammatory statements. The trial court noted that the motion for summary judgment was not supported by an affidavit from Mr. Justice attesting that he did not know about, read, prepare, or approve the filings. In the absence of such an affidavit, Mr. Justice's name,

---

[9] Under the version of Tennessee Supreme Court Rule 9 that was in effect when Mr. Justice was disbarred, attorneys that were disbarred could seek reinstatement after five years. See Tenn. Sup. Ct. R. 9, §§ 30.2, 30.4 (2019). Under the current version of the rule, attorneys disbarred on or after July 1, 2020 are ineligible for reinstatement. Tenn. Sup. Ct. R. 9, § 30.2.

address, telephone number, and Board of Professional Responsibility number, along with his filing and advocating for the filings, constituted "certification that the filings were not presented for any improper purpose, and that the factual contentions had evidentiary support." These also made Mr. Justice responsible for the pleadings filed under his name. The trial court held that, at the summary judgment stage, "[i]t would [have] require[d] actual averments that he did not read, prepare, approve, or know about the filings to require the Board to come forward with any evidence, beyond the filings themselves[,] to show [that Mr.] Justice was responsible for them."

With regard to Mr. Justice's argument about the propriety of the discovery sanction imposed against him, the trial court noted that the panel gave Mr. Justice "multiple opportunities to appropriately answer the Board's interrogatories, which had been outstanding for almost [two and a half] years, and which he had been ordered to answer over a year earlier, and again over a month before the hearing on the motion for sanctions." The trial court also stated that Mr. Justice and his attorney "engaged in a pattern of gamesmanship in an effort to avoid directly addressing his responsibility for the scandalous and impertinent statements contained in his filings in the juvenile court." The trial court held that the panel was empowered to impose the sanction pursuant to Tennessee Rule of Civil Procedure 37.02 and that "[a]ny lesser or other sanction would not be 'just' in regard to [Mr. Justice's] obstreperous and willful failure to answer the Board's interrogatories." In addition, the trial court held that even if the imposition of the discovery sanction constituted an abuse of discretion, that error was harmless.

The trial court affirmed the hearing panel's finding that Mr. Justice violated RPCs 3.5(e), 8.2(a), and 8.4(a) and (d). In so ruling, the trial court relied on the disparaging statements Mr. Justice made in the four pleadings he filed in the child custody case and found that Mr. Justice, as attorney of record, was "responsible for all the statements." The trial court also relied on several other inflammatory statements Mr. Justice made in the child custody case. These statements were made in the same motions containing the other offensive statements, but they were not alleged as misconduct in the petition for discipline.

Turning to the discipline imposed by the hearing panel, the trial court concluded that the hearing panel erred in applying the ABA Standards that established suspension as the baseline sanction. The trial court held that, because the hearing panel found that Mr. Justice made the offensive statements with the intent to obtain a personal benefit and because Mr. Justice had been suspended previously for similar misconduct, the hearing

panel should have applied ABA Standards 6.21,[10] 7.1,[11] and 8.1,[12] which establish disbarment as the baseline sanction. The trial court also found an aggravating circumstance not considered by the hearing panel—that Mr. Justice's actions were dishonest and selfishly motivated. The trial court ultimately held that Mr. Justice's sanction should be disbarment.[13]

Mr. Justice appealed to this Court pursuant to Tennessee Supreme Court Rule 9, section 33.1(d) and raised the following issues:

(1) Whether the trial court erred in affirming the hearing panel's decision of sanctions for Mr. Justice's failure to answer the Board's interrogatories or comply with two orders requiring him to answer the interrogatories.

(2) Whether the trial court erred in affirming the panel's findings that Mr. Justice made slanderous, disrespectful, and derogatory statements about Judge Ash, that the statements were not objectively reasonable under the circumstances under this Court's holding in Board of Professional Responsibility v. Parrish, 556 S.W.3d 153 (Tenn. 2018), that the statements were not protected by the First Amendment to the United States Constitution, and that the statements constituted ethical misconduct.

---

[10] ABA Standard 6.21 provides that "[d]isbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding."

[11] ABA Standard 7.1 provides that "[d]isbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."

[12] ABA Standard 8.1 provides:

Disbarment is generally appropriate when a lawyer:

(a) intentionally or knowingly violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client, the public, the legal system, or the profession; or

(b) has been suspended for the same or similar misconduct, and intentionally or knowingly engages in further similar acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession.

[13] The trial court's order did not address Mr. Justice's argument concerning the deposition of Judge Ash.

(3) Whether the trial court erred in affirming the panel's denial of Mr. Justice's motion for summary judgment.

(4) Whether the hearing panel abused its discretion and violated Tennessee Rule of Civil Procedure 52 by not specifying which of Mr. Justice's offensive statements the Board relied upon in the petition for discipline were false.

(5) Whether the hearing panel erred and abused its discretion by declining to compel Judge Ash to complete the proof deposition he gave by agreement of the parties.

(6) Whether the trial court erred in relying on statements not alleged in the petition for discipline, making findings of fact the hearing panel did not make, finding that the presumptive baseline sanction for Mr. Justice's conduct under the ABA Standards was disbarment rather than suspension, and concluding that the hearing panel abused its discretion in imposing a three-year suspension as discipline rather than disbarment.

## II. Standard of Review

As the "final arbiter of the professional conduct of all lawyers practicing in Tennessee . . . and the source of authority of the Board and all its functions," the Tennessee Supreme Court is "tasked with the ultimate disciplinary responsibility for violations of the ethical rules that govern the legal profession." Bd. of Pro. Resp. v. Justice, 577 S.W.3d 908, 923 (Tenn. 2019) (first quotation); Waggoner v. Bd. of Pro. Resp., 673 S.W.3d 227, 235 (Tenn. 2023) (citations omitted) (second quotation). "Attorneys charged with disciplinary violations have a right to an evidentiary hearing before a hearing panel, which determines whether a violation has occurred and, if so, the appropriate sanction for the violation." Justice, 577 S.W.3d at 923. The hearing panel's decision may be appealed to the chancery or circuit court by either party. Id. The trial court conducts its review upon "the transcript of the evidence before the hearing panel and its findings and judgment." Tenn. Sup. Ct. R. 9, § 33.1(b).

Either party may appeal the trial court's decision to this Court, which resolves the appeal based "upon the transcript of the record from the circuit or chancery court, which shall include the transcript of the evidence before the hearing panel." Tenn. Sup. Ct. R. 9, § 33.1(d). In reviewing disciplinary judgments, we apply the same standard of review as the trial court. Under that standard, we determine whether the hearing panel's findings, inferences, conclusions, or decisions are:

> (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted

exercise of discretion; or (5) unsupported by evidence which is both substantial and material in light of the entire record.

Tenn. Sup. Ct. R. 9, § 33.1(b).  To determine whether substantial and material evidence supports a hearing panel's decision, we evaluate "whether the evidence 'furnishes a reasonably sound factual basis for the decision being reviewed.'"  Justice, 577 S.W.3d at 923 (quoting Sneed v. Bd. of Pro. Resp., 301 S.W.3d 603, 612 (Tenn. 2010)).  "A reasonably sound basis is less than a preponderance of the evidence but more than a scintilla or glimmer."  Harris v. Bd. of Pro. Resp., 645 S.W.3d 125, 137 (Tenn. 2022) (quoting Beier v. Bd. of Pro. Resp., 610 S.W.3d 425, 438 (Tenn. 2020)).  A hearing panel's decision is arbitrary or capricious when it "is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion."  Parrish, 556 S.W.3d at 163 (quoting Hughes v. Bd. of Pro. Resp., 259 S.W.3d 631, 641 (Tenn. 2008)).  A hearing panel has abused its discretion if it "appl[ies] an incorrect legal standard or reach[es] a decision that is against logic or reasoning that causes an injustice to the party complaining."  Id. (alteration in original) (quoting Sallee v. Bd. of Pro. Resp., 469 S.W.3d 18, 42 (Tenn. 2015)).

We review questions of law de novo with no presumption of correctness.  Harris, 645 S.W.3d at 136.  However, we do not substitute our judgment for that of a hearing panel with regard to the weight of the evidence on questions of fact.  Id.  We conduct our review of disciplinary judgments "in light of our inherent power to promulgate and enforce disciplinary rules and to ensure that these rules are enforced in a manner that preserves both the integrity of the bar and the public trust in our system of justice."  Green v. Bd. of Pro. Resp., 567 S.W.3d 700, 713 (Tenn. 2019).

### III. Analysis

*A. Discovery Sanction*

Mr. Justice argues that the trial court erred in holding that the hearing panel did not abuse its discretion when it sanctioned him for discovery violations pursuant to Tennessee Rule of Civil Procedure 37.02(A) by deeming admitted the Board's interrogatories that he failed to answer.  Mr. Justice asserts that the sanctions "essentially grant[ed] the Board a default judgment" and violated his state and federal constitutional rights.  In addition, although he maintains that sanctions were not warranted, Mr. Justice argues that the sanctions imposed did not "match the offense."  The Board asserts that the trial court correctly held that the hearing panel did not abuse its discretion in imposing the sanctions, as the hearing panel possessed the authority to do so pursuant to Tennessee Rule of Civil Procedure 37.02(A), and Mr. Justice had failed to comply with two orders compelling him to answer the interrogatories.

Tennessee Rule of Civil Procedure 37.02 provides that trial courts may impose sanctions "as are just" on a party that disobeys a court order compelling discovery. Although "[t]he sanction . . . must fit the offense," Boles v. Nat'l Dev. Co., 175 S.W.3d 226, 244 (Tenn. Ct. App. 2005), trial judges have "wide discretion" in determining the sanction to be imposed. Mercer v. Vanderbilt Univ., Inc., 134 S.W.3d 121, 133 (Tenn. 2004). Because the Rules of Civil Procedure apply in disciplinary proceedings, see Tennessee Supreme Court Rule 9, section 34.3(a), hearing panels have the same authority as trial courts to impose sanctions of the discovery process. One sanction that a trial court or hearing panel may impose is entry of "[a]n order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order." Tenn. R. Civ. Proc. 37.02(A).

In this case, the Board served five interrogatories on Mr. Justice on July 18, 2018. Mr. Justice objected to the interrogatories based on the attorney-client privilege and the work product doctrine. The Board moved to compel responses to the interrogatories, which the hearing panel granted on June 5, 2019. In a scheduling order entered on September 1, 2020, the hearing panel again ordered Mr. Justice to respond to the interrogatories within fourteen days. After receiving no responses from Mr. Justice, the Board filed a motion for sanctions on October 9, 2020. The hearing panel granted the motion, finding that "[n]o just cause" existed for Mr. Justice's failure to comply with the discovery orders entered on June 5, 2019, and September 1, 2020. The panel determined that the appropriate sanction was "entry of an order that the facts into which inquiry was being made by the Board be taken as established for the purposes of the action in accordance with the claim of the Board under Tenn[essee] Rule [of] Civ[il] Pr[ocedure] 37.02(A)." Accordingly, the panel deemed admitted that Mr. Justice "prepared, read, and/or approved" the four motions containing inflammatory statements upon which the petition for discipline was based.

It is clear that the hearing panel possessed the authority to impose discovery sanctions against Mr. Justice pursuant to Tennessee Rule of Civil Procedure 37.02 and that it could impose the specific type of sanction it chose pursuant to Rule 37.02(A). Although Mr. Justice argues that sanctions were not warranted and that they did not match the offense, the record shows that Mr. Justice was given multiple opportunities to provide appropriate responses to the Board's interrogatories over the more than two years that the interrogatories were outstanding. During that time, the hearing panel ordered Mr. Justice on two separate occasions to appropriately respond to the interrogatories, and he failed to do so. The hearing panel stated that "[n]o just cause existed" for Mr. Justice's failure to comply with those orders. Given the multiple opportunities Mr. Justice had to respond, his failure to appropriately respond despite being ordered to do so twice, and the "wide discretion" afforded the hearing panel in determining the appropriate discovery sanction,

the hearing panel did not abuse its discretion in imposing the discovery sanction in this case.

We disagree with Mr. Justice's characterization of the discovery sanction as "case-ending," because even assuming the hearing panel erred in imposing the sanction, the error is harmless. Mr. Justice's name and Board of Professional Responsibility number appear on each of the four motions that contained inflammatory statements, and the name of his law firm appears on three of the four motions. Mr. Justice even personally argued the Motion for Interlocutory Appeal, which contained the majority of the offensive statements, and he did not disavow any of those statements. In addition, Mr. Justice signed the declaration of the Motion to Recuse as required by Tennessee Supreme Court Rule 10B. See Tenn. Sup. Ct. R. 10B, section 1.01 ("The motion [to recuse] shall be supported by an affidavit under oath or a declaration under penalty of perjury on personal knowledge and by other appropriate materials."). In his declaration, he stated that assertions in the motion to recuse were "true and correct to the best of [his] knowledge" and that the motion to recuse was not being presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Therefore, even disregarding the discovery sanction imposed against Mr. Justice, substantial and material evidence supports the hearing panel's finding that Mr. Justice "prepared, read, and/or approved" the four motions containing inflammatory statements upon which the petition for discipline was based. In sum, we affirm the trial court's ruling on this issue.

## B. Derogatory Statements

Mr. Justice next argues that the trial court erred in affirming the hearing panel's findings that he made derogatory statements about Judge Ash in violation of RPCs 3.5(e), 8.2(a)(1), and 8.4(a) and (d). According to Mr. Justice, the statements were objectively reasonable under the circumstances and protected by the First Amendment to the United States Constitution. The Board responds that the trial court correctly affirmed the hearing panel's finding that Mr. Justice made the derogatory statements about Judge Ash and that making the statements violated the RPCs.

### i. First Amendment

The free speech clause of the First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. However, an attorney's First Amendment rights are not without limits in the context of judicial proceedings. Bd. of Pro. Resp. v. Slavin, 145 S.W.3d 538, 549 & n.9 (Tenn. 2004). The First Amendment rights of attorneys "are often subordinated to other interests inherent in the judicial setting." Id. at 549. "[I]n the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed." Gentile v. State Bar of Nev., 501 U.S. 1030, 1071 (1991). While

"legitimate criticism of judicial officers is tolerable, 'an attorney must follow the Rules of Professional Conduct when so doing.'" Slavin, 145 S.W.3d at 549 (quoting Shortes v. Hill, 860 So.2d 1, 3 (Fla. Dist. Ct. App. 2003)); see also Parrish, 556 S.W.3d at 164 (stating that this Court in a prior case intended to "limit an attorney's criticisms of the judicial system and its officers to those criticisms which are consistent in every way with the sweep and the spirit of the Rules of Professional Conduct").

To assess whether Mr. Justice's speech that was alleged to have violated RPCs 3.5(e) and 8.4(d) was constitutionally protected, this Court utilizes the balancing process described in Gentile. 501 U.S. at 1050-51; see Manookian v. Bd. of Pro. Resp., 685 S.W.3d 744, 781-91 (Tenn. 2024) (applying the Gentile balancing process to determine whether attorney could be disciplined for speech that violated the RPCs). Under this balancing process, we "weigh[] the State's interest in the regulation of a specialized profession against [the] lawyer's First Amendment interest in the kind of speech . . . at issue." Gentile, 501 U.S. at 1073.

In determining Mr. Justice's interest in the Gentile balancing process, we consider the context and purpose of the speech. See Manookian, 685 S.W.3d at 783. The speech at issue in this case consisted of inflammatory statements about Judge Ash that Mr. Justice made in four motions he filed in the trial court during the court of child custody proceedings.[14] These statements, such as Mr. Justice's likening Judge Ash's demeanor to that of Yosemite Sam and asserting that Judge Ash ran from evidence as if it were the Ebola virus, can only be described as personal attacks that were meant to harass Judge Ash, criticize his rulings, and disrupt the child custody proceedings. Thus, they served no legitimate purpose. See id. at 783 ("[L]awyer speech that advances client interests, checks governmental power, or advocates on matters of public concern is provided the utmost protection under the First Amendment.") (quoting Matter of Abrams, 488 P.3d 1043, 1051 (Colo. 2021)). We give no weight to Mr. Justice's interest in this type of speech.

Conversely, the State's interest in regulating speech that violates RPCs 3.5(e) and 8.4(d) weighs heavily. The statements Mr. Justice made in his pleadings are considered in-court speech, the type of speech in which the State's interest in regulating lawyers is at its highest. See Parrish, 556 S.W.3d at 165; Slavin, 145 S.W.3d at 549. Further, the State has a strong interest in protecting the administration of justice and the integrity of the legal process. See Manookian, 685 S.W.3d at 785 ("A state's interest in regulating attorney speech is at its strongest when the regulation is necessary to preserve the integrity of the justice system . . . .") (quoting Matter of Abrams, 488 P.3d at 1051). When weighing this

---

[14] We need not address Mr. Justice's argument that there is no evidence he made the derogatory statements about Judge Ash. We have already upheld the discovery sanction imposed by the hearing panel, which deemed admitted that Mr. Justice "prepared, read, and/or approved" the four motions containing inflammatory statements upon which the petition for discipline was based.

interest against Mr. Justice's interest in harassing and criticizing Judge Ash in his pleadings, the State's interest overwhelmingly outweighs that of Mr. Justice.

In addition to making statements that were alleged to have violated RPCs 3.5(e) and 8.2(d), Mr. Justice also made a number of statements that impugned Judge Ash's integrity and were alleged to have violated RPC 8.2(a)(1). We apply a different standard to determine whether these statements are protected by the First Amendment. To determine whether in-court speech that violates RPC 8.2(a)(1) is constitutionally protected, we apply the objective "reasonable attorney" standard adopted in Parrish. 556 S.W.3d at 165-66. Under this standard, the court "assesses the statements in terms of 'what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances . . . [and] focus[ing] on whether the attorney had a reasonable factual basis for making the statements, considering their nature and the context in which they were made.'" Id. (alterations in original) (quoting Disciplinary Couns. v. Gardner, 793 N.E.2d 425, 431 (Ohio 2003)). "It is the reasonableness of the belief, not the state of mind of the attorney, that is determinative." Id. at 166 (quoting Matter of Holtzman, 577 N.E.2d 30, 34 (N.Y. 1991)).

In reviewing the statements Mr. Justice made that impugned Judge Ash's integrity, it is clear that the statements went far beyond the bounds of what an objectively reasonable attorney would make. Even considering the nature of the statements and the context in which they were made, see Parrish, 556 S.W.3d at 165-66, there was no reasonable factual basis for making the statements.

For example, Mr. Justice made several statements implying that Judge Ash ignored alleged attempts by the Plaintiff to sell time with the minor child and hold the minor child hostage for ransom. These statements are a mischaracterization of a proposed settlement agreement in the child custody case that the parties advised the trial court they had reached. Under the terms of the proposed settlement agreement, which ultimately fell through, Mr. Justice would have paid $200,000 in child support and $200,000 for the Plaintiff's attorney fees. Mr. Justice equates this agreement to the Plaintiff holding the minor child hostage for money and alleges that Judge Ash ignored this despicable behavior.

Mr. Justice also made statements about Judge Ash engaging in ex parte communications by "chatting up" the Plaintiff. See Tenn. Sup. Ct. R. 10, RJC 2.9(A) ("A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter . . . ."). The exchange to which Mr. Justice's statements referred occurred after the parties had announced the case had settled and while they were waiting for Mr. Justice to arrive. In that conversation, Judge Ash asked the Plaintiff if she was the public defender and why she would want to be the public defender since it is a difficult job. The Plaintiff indicated that the job was rewarding. She mentioned

- 20 -

that she was assisting with starting a drug court and that it was rewarding to see the success of the participants. Judge Ash said the public defender in Murfreesboro had helped him start a drug court, and the Plaintiff mentioned that Gerald, the public defender to whom Judge Ash was referring, was working with her on an unspecified project. Judge Ash reiterated his view that working as a public defender would be overwhelming, and the Plaintiff's attorney responded, "Kind of like a family law attorney?" This conversation was brief, took place in the presence of Mr. Justice's attorney, was not related to the child custody proceedings, and occurred after the parties announced the case had settled. Thus, it was not an improper ex parte communication.

Utilizing the objective reasonable attorney standard, the hearing panel found that a reasonable attorney would not believe there was a factual basis for the statements Mr. Justice made. For the aforementioned reasons, we agree.

In sum, after assessing Mr. Justice's statements under the Gentile balancing test and the objective reasonable attorney standard, we hold that none of Mr. Justice's statements were constitutionally protected. Accordingly, the trial court properly affirmed the hearing panel on this issue.

### ii. Substantial and Material Evidence

In determining whether substantial and material evidence supports a hearing panel's decision, we evaluate "whether the evidence 'furnishes a reasonably sound factual basis for the decision being reviewed.'" Justice, 577 S.W.3d at 923 (quoting Sneed, 301 S.W.3d at 612). "A reasonably sound basis is less than a preponderance of the evidence but more than a scintilla or glimmer." Harris, 645 S.W.3d at 137 (quoting Beier, 610 S.W.3d at 438). As we will explain, the hearing panel's findings on rule violations are all supported by substantial and material evidence.

### a. Statements About Integrity of a Judge

The hearing panel in this case found that Mr. Justice violated RPC 8.2(a)(1) by making statements about the integrity of Judge Ash that he knew were false or that he made with reckless disregard as to their truth or falsity. See Tenn. Sup. Ct. R. 8, RPC 8.2(a)(1) ("A lawyer shall not make a statement that the lawyer knows to be false or that is made with reckless disregard as to its truth or falsity concerning the qualifications or integrity of . . . a judge."). To support this finding, the hearing panel quoted several statements Mr. Justice made that impugned the integrity of Judge Ash, including the statements that Judge Ash appeared to be "in the bag" and was more interested in making the courthouse crowd happy than caring for the interests of the minor child.

Substantial and material evidence supports the hearing panel's finding that Mr. Justice violated RPC 8.2(a)(1). As explained above, the evidence in the record shows that the statements asserted or implied that Judge Ash ignored judicial corruption, disregarded alleged attempts by the Plaintiff to sell time with the minor child, engaged in ex parte communications with the Plaintiff, and cared more about whether the courthouse crowd was happy than the interests of the minor child. These statements attacked Judge Ash's integrity, lacked any sort of factual basis, and were gross mischaracterizations of a proposed settlement agreement between the parties and a brief conversation between Judge Ash and the Plaintiff. The evidence in the record provides a "reasonably sound factual basis" for the hearing panel's finding that Mr. Justice violated RPC 8.2(a)(1). See Justice, 577 S.W.3d at 923. Thus, the trial court properly affirmed the hearing panel's finding that Mr. Justice violated RPC 8.2(a)(1).

### b. Conduct Intended to Disrupt a Tribunal

The hearing panel found that a "reasonable attorney would believe the statements filed in the four motions that Mr. Justice prepared, read, and/or approved were filed for the improper purposes of harassment, delay[,] and to needlessly increase litigation costs and that they constitute[d] abusive and obstreperous conduct which was intended to disrupt" the child custody proceedings. The hearing panel found that Mr. Justice's intentional acts of misconduct disrupted the proceedings in the form of "delay that resulted from time taken in the proceeding to address the inappropriate statements in the motions." The hearing panel ultimately determined that Mr. Justice's conduct in "preparing, reading[,] and/or approving the four motions was conduct intended to disrupt a tribunal" in violation of RPC 3.5(e). See Tenn. Sup. Ct. R. 8, RPC 3.5(e) ("A lawyer shall not: . . . engage in conduct intended to disrupt a tribunal.").

Comment 5 to RPC 3.5(e) explains that an attorney's "function is to present evidence and argument so that the cause may be decided according to law." Tenn. Sup. Ct. R. 8, RPC 3.5 cmt. 5. An attorney can "present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics." Id. Even if an attorney disagrees with a court's ruling, "zealous representation of a client 'never justifies the use of disrespectful, unprofessional, or indecorous language to the court.'" Bailey v. Bd. of Pro. Resp., 441 S.W.3d 223, 234 (Tenn. 2014) (quoting In re Moncier, 550 F.Supp.2d 768, 807 (E.D. Tenn. 2008)).

Mr. Justice's conduct in filing motions containing pejorative statements about Judge Ash is precisely the type of obstreperous conduct prohibited by RPC 3.5(e). Mr. Justice's reckless attacks against Judge Ash were unnecessary and served no purpose other than to interfere with the orderly conduct of the child custody proceedings. Mr. Justice's intent to disrupt the proceedings is evident from his continued use of offensive statements in his

pleadings after Judge Ash ordered him to cease from doing so on multiple occasions. Although Mr. Justice may have disagreed with Judge Ash's rulings, that is not justification for his use of disrespectful and unprofessional language. In sum, substantial and material evidence supports the hearing panel's finding that Mr. Justice violated RPC 3.5(e). The trial court properly affirmed the hearing panel's finding as to this violation.

### c. Conduct Prejudicial to the Administration of Justice

The hearing panel found that Mr. Justice's use of inappropriate statements in the motions he filed "undermin[ed] public confidence in the administration of justice" in violation RPC 8.4(d) and that his violations of RPCs 3.5(e), 8.2(a)(1), and 8.4(d) violated RPC 8.4(a). See Tenn. Sup. Ct. R. 8, RPC 8.4(a), (d) ("It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another . . . [and] (d) engage in conduct that is prejudicial to the administration of justice.").

An attorney's speech is sanctionable "if it is highly likely to obstruct or prejudice the administration of justice." Slavin, 145 S.W.3d at 550. These narrow restrictions on speech "are justified by the integral role that attorneys play in the judicial system, which requires them to refrain from speech or conduct that may obstruct the fair administration of justice." Id. (quoting Gardner, 793 N.E.2d at 429).

In Parrish, this Court held that similar inappropriate and disparaging comments about a judge constituted conduct prejudicial to the administration of justice. 556 S.W.3d at 167. Substantial and material evidence supports the hearing panel's conclusion that Mr. Justice's conduct in this case does as well. In addition, the evidence supporting the hearing panel's findings that Mr. Justice violated RPCs 3.5(e), 8.2(a)(1), and 8.4(d) supports the hearing panel's findings that Mr. Justice violated RPC 8.4(a). Thus, the trial court correctly affirmed the hearing panel's finding that Mr. Justice violated RPCs 8.4(a) and (d).

### C. Motion for Summary Judgment

Mr. Justice next argues that the hearing panel erred when it denied his motion for summary judgment after the Board failed to respond to his statement of undisputed material facts and failed to comply with Tennessee Rule of Civil Procedure 56.07 by not submitting an affidavit specifying why more time was needed to respond to the motion for summary judgment. The Board responds that the trial court correctly affirmed the hearing panel's denial of Mr. Justice's motion for summary judgment.

Summary judgment is appropriately granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law." Tenn. R. Civ. Proc. 56.04. When the moving party does not bear the burden of proof at trial, it may satisfy its burden of production "by affirmatively negating an essential element of the nonmoving party's claim" or "by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense." Rye v. Women's Care Ctr. of Memphis, 477 S.W.3d 235, 264 (Tenn. 2015). The moving party must support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. Proc. 56.03.

Once the moving party satisfies its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Tenn. R. Civ. Proc. 56.06. If the nonmoving party cannot present by affidavit facts essential to justify its opposition to the motion for summary judgment, it may file an affidavit stating its reasons for not being able to do so. Tenn. R. Civ. Proc. 56.07. If such an affidavit is filed, the court may deny the motion for summary judgment or "may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Id.

In ruling on a motion for summary judgment, the trial court "must accept the nonmoving party's evidence as true[] and view both the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the nonmoving party." Tatham v. Bridgestone Ams. Holding, Inc., 473 S.W.3d 734, 751-52 (Tenn. 2015). Appellate courts review a trial court's decision on a motion for summary judgment de novo with no presumption of correctness. Rye, 477 S.W.3d at 250.

In this case, Mr. Justice filed his motion for summary judgment on November 13, 2018. The Board responded on December 17, 2018, and claimed that it should not be required to respond to the motion for summary judgment until it received the discovery it sought. Specifically, the Board wished to take the depositions of Mr. Rickman and Mr. Justice, and it had not received responses to its interrogatories from Mr. Justice. The Board relied on Tennessee Rule of Civil Procedure 56.07 in requesting additional time to respond to the motion. However, it did not submit an affidavit to support its request.

On September 30, 2019, the Board filed a second response to the motion for summary judgment and a statement of undisputed facts. The Board objected to Mr. Justice's statement of undisputed facts and explained that many of the purported facts were actually legal conclusions.

The hearing panel denied Mr. Justice's motion for summary judgment on April 29, 2020. It determined that the petition for discipline sufficiently alleged facts that, taken as true, established violations of RPCs 3.5(e), 8.2(a), and 8.4(a) and (d). The hearing panel concluded that Mr. Justice's denial of responsibility for the inflammatory statements

- 24 -

forming the basis of the petition for discipline created a genuine issue of material fact for determination and that Mr. Justice had not shown that there was no dispute of fact on that issue.

On appeal, Mr. Justice argued to the trial court that the hearing panel should have granted his motion for summary judgment because the Board did not file an affidavit with its December 17, 2018, response. The trial court agreed that the Board should have filed an affidavit supporting its request for additional time to respond to the motion for summary judgment. However, the trial court held that the hearing panel did not err when it denied Mr. Justice's motion for summary judgment. The trial court noted that the discovery the Board wished to obtain sought information on matters relevant to the summary judgment motion. The trial court also noted that a motion to compel a response to the Board's interrogatories was pending when Mr. Justice filed his motion for summary judgment. The trial court explained that "the facts that would have been alleged in such an affidavit [were] clearly apparent in the Administrative Record existing before the [hearing panel] at the time it granted the Board's request." Additionally, the trial court determined that, even if the hearing panel erred by granting the Board additional time to respond to the motion for summary judgment, the error was harmless because evidence in the record before the hearing panel refuted Mr. Justice's assertion that there was no evidence that he knew about, read, prepared, or approved the filings containing the inflammatory statements. Citing examples of evidence refuting Mr. Justice's assertion, the trial court pointed to the fact that the signature blocks on the filings indicated that they were prepared by Mr. Justice, Mr. Justice's law firm, and his co-counsel. The trial court also noted that Mr. Justice was a party in the child custody case and that he and his firm were counsel of record.

The trial court also pointed out that Mr. Justice did not submit an affidavit in support of his motion for summary judgment in which he attested that he did not know about, read, prepare, or approve the motions before they were filed. In the absence of such an affidavit, the fact that Mr. Justice's name, address, telephone number, and Board of Professional Responsibility number were on the motions, along with Mr. Justice's filing and advocating for the motions, constituted "certification that the filings were not presented for any improper purpose, and that the factual contentions had evidentiary support." Because this made Mr. Justice "responsible for the content of the filings made under his name," Mr. Justice needed to submit an affidavit stating that he did not read, prepare, approve, or know about the filings in order to require the Board to produce evidence that Mr. Justice was responsible for them. Accordingly, the trial court held that Mr. Justice's motion for summary judgment was properly denied.

We agree with the sound reasoning of the trial court on this issue. Indeed, the Board should have filed an affidavit supporting its request for additional time to respond to the motion for summary judgment, as Tennessee Rule of Civil Procedure 56.07 specifically provides that if the non-moving party cannot present facts essential to justify its opposition

to the motion for summary judgment, its reasons should be apparent in an affidavit. Tenn. R. Civ. Proc. 56.07. However, the hearing panel did not err when it granted the Board's request for additional time to respond to the motion for summary judgment, because, as the trial court observed, the facts that would have been alleged in such an affidavit were apparent from the administrative record before the hearing panel. Specifically, the Board had filed a motion to compel responses to interrogatories that sought information pertinent to the summary judgment motion. At the time the Board requested additional time to respond to the summary judgment motion, the motion to compel was still pending.

In addition, even assuming the hearing panel erred in granting additional time to respond, that error was harmless, because it was evident from the record before the hearing panel that there was a dispute of material fact as to whether Mr. Justice was responsible for the offensive statements at issue. The petition for discipline alleged that Mr. Justice made statements in violation of RPCs 3.5(e), 8.2(a), and 8.4(a) and (d). Mr. Justice denied responsibility for the statements and claimed that there was no evidence that he knew about, read, prepared, or approved them prior to their being filed. However, the record before the hearing panel contained sufficient evidence to refute Mr. Justice's assertion. As the trial court observed, the signature blocks on the pleadings in the child custody case indicated that they were filed by Mr. Justice, his firm, and his co-counsel, and Mr. Justice was both a party and counsel of record in that case. These facts sufficiently countered Mr. Justice's assertion that there was no evidence he knew about, read, prepared, or approved the pleadings containing offensive statements. Accordingly, we affirm the trial court's ruling that the hearing panel did not err by denying Mr. Justice's motion for summary judgment.

### D. Tennessee Rule of Civil Procedure 52

Mr. Justice next argues that the hearing panel failed to make specific findings of fact under Tennessee Rule of Civil Procedure 52.01 because it did not specify which of the offensive statements at issue were false. As part of this argument, Mr. Justice contends that the hearing panel's judgment was not supported by the evidence because the Board did not offer proof that the statements at issue were false.

Tennessee Rule of Civil Procedure 52.01 provides that, "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." This mandate "facilitates appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision." In re Houston D., 660 S.W.3d 704, 721 (Tenn. Ct. App. 2022) (internal quotations omitted) (citing Gooding v. Gooding, 477 S.W.3d 774, 782 (Tenn. Ct. App. 2015)). Without findings of fact and conclusions of law, a reviewing court is "left to wonder on what basis the court reached its ultimate decision." Id. (internal quotations omitted).

In this case, the hearing panel made extensive findings of fact regarding the offensive statements Mr. Justice made in the child custody dispute. Within its findings of fact, the hearing panel listed each of the offensive statements made by Mr. Justice and found that "[a] reasonable attorney would not believe there was a factual basis for many of the statements made in the four motions that Mr. Justice prepared, read[,] and/or approved." The hearing panel specifically pointed to statements alleging that Judge Ash "sanctioned child abuse," "[ran] from certain evidence as if it [were] the Black Plague," "[was] more interested in making the Roane County courthouse crowd happy and receiving their daily smiles than he [was] in caring for [the minor child's] bests interests," and was "simply playing a shell game with a child." The findings of fact provided a clear understanding of the basis for the hearing panel's decision.

Moreover, the Board was not required to offer proof that the offensive statements Mr. Justice made were false, because abusive and derogatory language directed toward the court need not be proven false in order to constitute ethical misconduct. Parrish, 556 S.W.3d at 164. In another disciplinary action involving an attorney who made pejorative in-court statements about a judge, we quoted with approval the following observation made by the Supreme Court of Kentucky: "Respondent appears to believe that truth . . . is a defense to the charge against him. In this respect he has totally missed the point. There can never be a justification for a lawyer to use such scurrilous language with respect to a judge in pleadings or in open court." Slavin, 145 S.W.3d at 549 (quoting Ky. Bar Ass'n v. Waller, 929 S.W.2d 181, 183 (Ky. 1996)). Accordingly, Mr. Justice is not entitled to relief on this issue.

*E. Deposition of Judge Ash*

Mr. Justice argues that he was prejudiced by Judge Ash ending his proof deposition before Mr. Justice finished his questioning and by disciplinary counsel's conduct during the deposition. The Board responds that Mr. Justice waived these issues by not raising them in the trial court. In the alternative, the Board argues that it was within the discretion of the hearing panel to refuse to order Judge Ash to appear for another deposition.

We first address the Board's argument that Mr. Justice waived these issues. As the Board correctly states, a party may not raise an issue on appeal that it did not raise in the trial court. Jackson v. Burrell, 602 S.W.3d 340, 344 (Tenn. 2020). Further, "an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with [Tennessee Rule of Appellate Procedure] 27(a)(4)." Hodge v. Craig, 382 S.W.3d 325, 335 (Tenn. 2012); see Tenn. R. App. P. 27(a)(4) (providing that an appellant's brief must contain a "statement of the issues presented for review"); Childress v. Union Realty Co., 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) ("We consider an issue waived where it is argued in the brief but not designated as an issue.").

- 27 -

In this case, Mr. Justice argued the issues concerning Judge Ash's deposition in his trial court brief. However, Mr. Justice did not properly raise these issues, as he did not list them in the "Questions Presented" section of his brief. As a result, Mr. Justice has waived these issues.

*F. Trial Court's Findings and Modification of Sanction*

Mr. Justice's final argument is that the trial court erred in increasing the sanction imposed against him from a three-year suspension to disbarment. As part of this argument, Mr. Justice contends that the trial court erred in relying on statements not alleged in the petition for discipline and making findings of fact that the hearing panel did not make. The Board counters that the trial court correctly enhanced Mr. Justice's sanction to disbarment because the hearing panel acted arbitrarily and capriciously in applying ABA Standards 6.12, 6.22, and 7.2, which call for suspension as the presumptive baseline sanction.

Tennessee Supreme Court Rule 9, section 33.1(b) provides the parameters of the trial court's authority in disciplinary appeals. Under the rule, the trial court

> may reverse or modify the decision [of the hearing panel] if the rights of the party filing the Petition for Review have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record.

Tenn. Sup. Ct. R. 9, § 33.1(b). Rule 33.1(b) makes it clear that the hearing panel's decision may only be modified or reversed if "the rights of the party filing the Petition for Review" were prejudiced by the hearing panel's decision.

In this case, Mr. Justice was the only party that filed a petition for review. Thus, under Rule 9, section 33.1(b), the trial court could only modify or reverse the judgment if Mr. Justice's rights were prejudiced by the hearing panel's decision. In reviewing the punishment imposed by the hearing panel, the trial court determined that the hearing panel erred in applying ABA Standards 6.12, 6.22, and 7.2, which call for suspension as the presumptive baseline sanction, and it modified Mr. Justice's punishment from a three-year suspension to disbarment. This increase in punishment makes it clear that the trial court did not find that Mr. Justice's rights had been prejudiced by the hearing panel's decision. Had the trial court found that Mr. Justice's rights were prejudiced by the hearing panel's decision regarding his punishment, the trial court certainly could have modified the suspension to a lesser punishment. But, because the Board did not file its own petition for

review, the trial court could not increase the punishment. See Parrish, 556 S.W.3d at 161, 170 (affirming trial court's increase of punishment imposed by hearing panel after Board appealed hearing panel decision). Accordingly, based on Rule 9, section 33.1(d), the trial court erred in increasing Mr. Justice's punishment to disbarment.[15]

## G. Review Under Inherent Authority

Although Rule 9, section 33.1(b) limits the trial court's authority in attorney disciplinary actions, this Court reviews all disciplinary judgments under our inherent authority in the Tennessee Constitution. In re Sitton, 618 S.W.3d 288, 294 (Tenn. 2021); In re Vogel, 482 S.W.3d 520, 530 (Tenn. 2016); see Green, 567 S.W.3d at 713 (stating that we review disciplinary judgments "in light of our inherent power to promulgate and enforce disciplinary rules and to ensure that these rules are enforced in a manner that preserves both the integrity of the bar and the public trust in our system of justice"). In determining the appropriate sanction, "it is helpful to consider sanctions we have imposed in cases with similar facts." Parrish, 556 S.W.3d at 169. We evaluate attorney disciplinary matters in light of their particular facts and circumstances, even as we "consider the sanctions that have been imposed in prior cases that present similar circumstances so as to maintain consistency and uniformity in disciplinary proceedings." Bd. of Pro. Resp. v. Maddux, 148 S.W.3d 37, 40 (Tenn. 2004).

Before comparing the punishment in this case to those in prior cases with similar facts, we first consider the appropriateness of the punishment under the circumstances of this case. Courts look to the ABA Standards in determining the appropriate punishment in attorney disciplinary matters. Vogel, 482 S.W.3d at 533. The ABA Standards "serve as 'guideposts' for determining the appropriate punishment rather than 'rigid rules that dictate a particular outcome.'" Id. (quoting Hyman v. Bd. of Pro. Resp., 437 S.W.3d 435, 447 (Tenn. 2014)). The ABA Standards direct the court to consider:

(1) What ethical duty did the lawyer violate? (A duty to the client, the public, the legal system, or the profession?);

(2) What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly, or negligently?);

(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury); and

(4) Are there any aggravating or mitigating circumstances?

---

[15] Given our holding on this issue, we need not address Mr. Justice's argument that the trial court relied on statements not alleged in the petition for discipline as the basis for increasing his punishment.

Bailey, 441 S.W.3d at 232.

The hearing panel in this case determined that, based on its findings of fact and Mr. Justice's misconduct, suspension was the appropriate baseline sanction. In reaching this conclusion, the hearing panel applied the following ABA Standards:

> ABA Standard 6.12: "Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding."

> ABA Standard 6.22: "Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding."

> ABA Standard 7.2: "Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty as a professional and causes injury or potential injury to a client, the public, or the legal system."

In explaining its decision to apply these Standards, the hearing panel noted that Mr. Justice knowingly violated the trial court's January 2, 2017 order to cease from filing motions with derogatory language by filing two more motions with offensive statements. The hearing panel added that, in filing these motions, Mr. Justice "intended to interfere with the legal proceeding and obtain a benefit through securing his desired personal outcome in the proceeding" and that Mr. Justice intended to deceive the court that would review the matter on appeal. The hearing panel also stated that Mr. Justice's pejorative statements were "so prejudicial to the administration of justice that they significantly undermine the integrity and public confidence in the administration of justice."

The Board argues that the hearing panel abused its discretion by failing to consider ABA Standards 6.21, 7.1, and 8.1, which establish disbarment as the applicable baseline sanction, based on the hearing panel's finding that Mr. Justice acted with intent to secure a personal benefit and Mr. Justice's ethical misconduct in a previous case. In reviewing other cases involving attorneys acting with intent to secure a personal benefit, it appears that the benefits at issue often consist of benefits that are financial in nature. See Skouteris v. Bd. of Pro. Resp., 430 S.W.3d 359, 366, 370-71 (Tenn. 2014) (applying ABA Standards requiring intent to obtain a benefit in a case where attorney converted funds in his trust account for his personal benefit); Matter of Crawford, 893 S.E.2d 39, 48 (Ga. 2023)

(finding that a former judge's misuse of court registry funds constituted a benefit under ABA Standard 6.21); Matter of Lain, 857 S.E.2d 668, 670-76 (Ga. 2021) (citing ABA Standard 6.21 as grounds for disbarment based on attorney's collection of unreasonable fees, failure to refund unearned fees, filing of motion containing false information in hopes of obtaining a supersedeas, and a number other actions warranting sanctions); Matter of Disciplinary Proc. Against Jensen, 430 P.3d 262, 271 (Wash. 2018), as amended (Jan. 7, 2019) (citing ABA Standard 6.21 as grounds for disbarment when an attorney violated a court order "to obtain a financial benefit for himself, even going so far as to demand a secret payoff"); People v. Ward, 470 P.3d 1053, 1065-66 (Colo. 2017) (citing ABA Standards 6.21 and 7.1 as grounds for disbarment of attorney that misled clients and failed to refund fees after she began representation she knew she could not complete due to an impending suspension); Matter of Harrington, 385 P.3d 905, 915, 918 (Kan. 2016) (finding ABA Standard 7.1 applicable where attorney converted client funds for his personal use); People v. Ra'shadd, 110 P.3d 388, 393 (Colo. 2005) (finding that disbarment was appropriate baseline sanction under ABA Standard 6.21 based on attorney's twice violating court orders when he failed to account for converted funds and failed to pay child support); see also In re Roose, 69 P.3d 43, 47 (Colo. 2003), as modified on denial of reh'g (May 12, 2003) (finding an attorney's intentional departure from the courtroom during trial did not constitute "the kind of benefit contemplated" by ABA Standard 6.21 even if it "could be seen as a deliberate attempt to force an additional hearing"). However, the language of ABA Standards 6.21 and 7.1 does not necessarily foreclose the possibility of a personal benefit involving something other than financial gain. See In re Sniadecki, 924 N.E.2d 109, 115-19 (Ind. 2010) (disbarring attorney after he knowingly violated court order or rule with intent to obtain a benefit when he filed false documents with the Supreme Court, committed perjury and forgery, and attempted to bribe a witness); In re Rice, 260 P.3d 1020, 1032 (Alaska 2011) (finding that attorney intended to obtain benefit of delaying and impeding disciplinary investigation as contemplated by ABA Standard 6.21 by failing to respond to subpoena). Under the circumstances of this particular case, however, we decline to conclude that ABA Standards 6.21 and 7.1 apply to this case.[16]

In addition, ABA Standard 8.1 does not apply in this case. That Standard requires the misconduct at issue to be the same or similar to the prior misconduct. See ABA Standard 8.1. In Mr. Justice's previous case, in which he was disbarred from the practice of law, the hearing panel found that Mr. Justice violated multiple RPCs when he knowingly testified falsely in a federal court case, falsified evidence, and charged an unreasonable attorney fee. Justice, 577 S.W.3d at 921-22, 932. In the present case, Mr. Justice filed motions containing statements known to be false or made with reckless disregard as to their truth or falsity concerning the integrity of Judge Ash and engaged in conduct intended to disrupt the child custody case. Although this presents a close question, we conclude that

---

[16] In reaching this conclusion, we expressly do not limit the potential application of ABA Standards 6.21 and 7.1 to conduct involving financial benefits to the attorney.

Mr. Justice's misconduct in the prior case is not sufficiently similar to his misconduct in the present case to warrant consideration of ABA Standard 8.1.

Upon our review of the record and the hearing panel's findings, we hold that the hearing panel did not abuse its discretion in applying ABA Standards 6.12, 6.22, and 7.2, nor did it select them arbitrarily or capriciously. The evidence in the record shows that Mr. Justice knew that false statements were being submitted to the court in his pleadings and that he took no remedial action. Further, Mr. Justice knew he was violating the trial court's order to cease from making offensive and pejorative statements. It is also clear from the record that Mr. Justice's conduct caused injury to the Plaintiff in the child custody dispute. Mr. Justice's statements had to be addressed by the trial court on several occasions, which needlessly delayed and interfered with the legal proceedings. Finally, it is evident from the record that Mr. Justice's conduct caused injury or potential injury to the legal system by undermining its integrity and impairing the public's confidence in it. Therefore, the hearing panel correctly established suspension as the appropriate baseline sanction.

The hearing panel then considered potential aggravating and mitigating factors that would justify an increase or decrease in the baseline sanction. The ABA Standards suggest a number of aggravating and mitigating circumstances, although the list is "illustrative rather than exclusive." Lockett v. Bd. of Pro. Resp., 380 S.W.3d 19, 28 (Tenn. 2012). The hearing panel determined that four aggravating factors existed justifying an increase in the degree of discipline to be imposed on Mr. Justice: (1) a prior disciplinary offense; (2) a pattern of misconduct; (3) refusal to acknowledge the wrongful nature of his conduct; and (4) substantial experience in the practice of law.

Substantial and material evidence supports these findings. The record indicates that Mr. Justice was licensed to practice law in Tennessee in 1998. It also shows that Mr. Justice continued to make derogatory statements in his pleadings despite being told by the trial court to cease from doing so on multiple occasions. The record makes it abundantly clear that Mr. Justice has not acknowledged the wrongful nature of his conduct. Finally, as previously stated, the record shows that Mr. Justice was disbarred in a separate disciplinary matter in 2019.

Based on its application of the ABA Standards and the four aggravating factors, the hearing panel concluded that Mr. Justice "should be suspended from the practice of law for three (3) years from the date, if any, when he is reinstated to practice law." Under our Supreme Court Rules, an attorney's suspension must be more than thirty days but less than ten years. Tenn. Sup. Ct. R. 9, § 12.2(a)(2). ABA Standard 2.3 provides that suspensions should fall between six months and three years. With four aggravating factors justifying an increase in Mr. Justice's discipline and no mitigating factors, a three-year suspension appears to be an appropriate punishment for Mr. Justice's misconduct.

We now consider the three-year suspension in light of sanctions that have been imposed in prior cases that presented similar circumstances. Maddux, 148 S.W.3d at 40. We do this to "maintain consistency and uniformity in disciplinary proceedings." Id. For purposes of our analysis, cases presenting similar circumstances are cases in which an attorney has made pejorative statements about a judge in court filings or in open court.

In reviewing Tennessee cases that presented similar circumstances, it is evident that the typical punishment is a suspension. See, e.g., Parrish, 556 S.W.3d at 170 (six-month suspension for making pejorative statements in motions to recuse); Slavin, 145 S.W.3d at 551 (two-year suspension for making in-court statements that impugned the integrity of the trial court); Farmer v. Bd. of Pro. Resp., 660 S.W.2d 490, 491-93 (Tenn. 1983) (sixty-day suspension for attorney's use of "scurrilous and improper language" about appellate court judges and opposing counsel in briefs he filed).

Cases from other jurisdictions involving similar facts are also instructive. Like the cases from Tennessee, a suspension is typically imposed when an attorney makes pejorative statements about a judge in court filings or open court. See, e.g., Waller, 929 S.W.2d at 183 (six-month suspension for use of offensive language about trial judge in written memorandum filed with the court); Gardner, 793 N.E.2d at 433 (six-month suspension for making statements in a motion that questioned the integrity of the appellate court); Cleveland Metro. Bar Ass'n v. Morton, 185 N.E.3d 65, 74 (Ohio 2021) (one-year suspension for making statements in a court pleading accusing the appellate courts of denying his appeal based on political motives); Lawyer Disciplinary Bd. v. Hall, 765 S.E.2d 187, 201 (W. Va. 2014) (three-month suspension for derogatory statements about administrative law judge in a petition for review); In re Madison, 282 S.W.3d 350, 362 (Mo. 2009) (six-month suspension for making in-court and out-of-court statements that suggested lack of integrity of judges); Matter of Vincenti, 458 A.2d 1268, 1273-76 (N.J. 1983) (one-year suspension for "calculated pattern of irresponsible, abusive[,] and obnoxious behavior both in and outside of the courtroom" directed towards the judge, opposing counsel, and others).

The Parrish case is particularly instructive due to its similarities with the present case. 556 S.W.3d at 155. In Parrish, the Board initiated disciplinary proceedings against attorney Larry Parrish after Mr. Parrish filed motions to recuse containing numerous pejorative statements about three appellate judges. Id. A hearing panel concluded that Mr. Parrish violated the same four RPCs as Mr. Justice violated in this case, and it determined that Mr. Parrish should receive a public censure as punishment. Id. at 161. After the Board appealed the decision to the trial court, the trial court increased Mr. Parrish's punishment to a six-month suspension based on the hearing panel's failure to articulate the ABA Standards on which it had relied. Id. at 161-62. This Court affirmed the judgment of the trial court. Id. at 170.

At first blush, given that Mr. Parrish received a six-month suspension for violating the same RPCs as Mr. Justice, it would appear that a three-year suspension is too harsh for Mr. Justice's misconduct. However, though the misconduct was similar, Mr. Justice's misconduct warrants a greater degree of discipline. In Parrish, the hearing panel found two aggravating factors applicable—Mr. Parrish's substantial experience in the practice of law and his refusal to acknowledge the wrongful nature of his conduct. Id. at 168. However, the panel also found that two mitigating factors applied—Mr. Parrish's lack of disciplinary history and his positive reputation in the community. Id. In the present case, the hearing panel found that four aggravating factors and zero mitigating factors applied. Notably, one of the four aggravating factors was Mr. Justice's prior disciplinary history. Mr. Justice was disbarred in 2019 for giving a false statement under oath, testifying falsely during a federal district court hearing, and seeking an unreasonable attorney fee. Justice, 577 S.W.3d at 932-33. Thus, although Mr. Parrish and Mr. Justice violated the same RPCs, the circumstances of Mr. Justice's case warrant greater discipline.

In sum, after reviewing the facts of Mr. Justice's case in light of other cases presenting similar circumstances, we hold that the three-year suspension imposed by the hearing panel is appropriate.

However, before concluding, we must address one particular aspect of the suspension imposed by the hearing panel. The hearing panel imposed a three-year suspension against Mr. Justice that would begin "from the date, if any, when he is reinstated to practice law . . ." The hearing panel erred in delaying the effective date of Mr. Justice's suspension. Tennessee Supreme Court Rule 9, section 28.1 provides that orders imposing suspensions "are effective upon entry," and no other provision in Tennessee Supreme Court Rule 9 permits the hearing panel to delay the effective date of a suspension. Further, Tennessee Supreme Court Rule 9, section 12.2 requires suspensions imposed against attorneys to "result in some cessation of the practice of law for not less than thirty days." The suspension imposed by the hearing panel in this case does not guarantee that Mr. Justice would be suspended for at least thirty days, as the suspension is contingent on Mr. Justice's being reinstated from the disbarment imposed against him in his prior disciplinary matter. Therefore, we modify the punishment imposed by the hearing panel to a three-year suspension that shall begin immediately upon the entry of this Opinion.

**CONCLUSION**

We affirm the judgment of the trial court on all issues with the exception of the issue regarding Mr. Justice's punishment. We reverse the trial court's judgment on that issue and reinstate the three-year suspension imposed by the hearing panel. However, the three-year suspension shall begin immediately upon the entry of this Opinion. Mr. Justice shall also obtain the additional continuing legal education hours and pay the costs ordered by

the hearing panel.  Costs of this appeal are taxed to Mr. Justice, for which execution may issue if necessary.


_____
JEFFREY S. BIVINS, JUSTICE